JUDGE COTE

14 CV 5226



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ERIC GREENBERG,

             Plaintiff,

   - against -

HUDSON BAY MASTER FUND LTD.,
IROQUOIS MASTER FUND LTD.,
AMERICAN CAPITAL MANAGEMENT LLC,
GRQ CONSULTANTS, INC. 401K, BARRY HONIG,
RICHARD MOLINSKY, and WPCS
INTERNATIONAL INCORPORATED,

             Defendants.

------------------------------------------------------------x

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, by his attorneys, alleges, based upon knowledge with respect to the facts relating to him and upon information and belief with respect to all other allegations, as follows:

## INTRODUCTION

1.    This action is brought pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), [15 U.S.C. 78p(b)] ("Section 16(b)") in order to recover short-swing insider trading profits realized by defendants Hudson Bay Master Fund Ltd., Iroquois Master Fund Ltd., American Capital Management LLC, GRQ Consultants, Inc. 401K, Barry Honig, and Richard Molinsky, (collectively referred to as "Defendants") while they were statutory insiders of WPCS International Incorporated ("WPCS" or the "Company".)

1

2. Defendants are members of a group that together owned more than 10% of the outstanding common stock of WPCS and accordingly, each member of the group is deemed to be the beneficial owner of the WPCS common stock owned by the other members of the group. The group conduct is manifested in joint agreements governing the purchase and sale of WPCS securities as well as in a transaction involving the sale of BTX Trader LLC ("BTX") from Defendants to the Company.

3. Each Defendant is, therefore, statutorily deemed to have been during all relevant times, a WPCS insider with access to material non-public information concerning WPCS's operations and future business prospects and is subject to the strict liability provisions of Section 16(b). Section 16(b) requires company insiders to disgorge any profits earned through short-swing insider trading (*i.e.*, purchases and sales within a six month period).

## PARTIES

4. Plaintiff Eric Greenberg is a shareholder of WPCS.

5. Defendant Hudson Bay Master Fund Ltd., organized under the laws of the Cayman Islands, maintains its principal offices at 777 Third Avenue, 30th Floor, New York, New York 10017.

6. Defendant Iroquois Master Fund Ltd., organized under the laws of the Cayman Islands, maintains its principal offices c/o Iroquois Capital Management, LLC at 641 Lexington Avenue, 26th Floor, New York, New York 10022.

7. Defendant American Capital Management LLC, organized under the laws of the Cayman Islands, maintains its principal offices c/o Iroquois Capital Management, LLC at 641 Lexington Avenue, 26th Floor, New York, New York 10022.

8. Defendant Barry Honig is an individual residing in Boca Raton, Florida.

9.  Defendant GRQ Consultants, Inc. 401K, maintains its principal offices c/o Barry Honig at 4440 Biscayne Boulevard, Suite 850, Miami, Florida 33137.

10. Defendant Richard Molinsky resides at 51 Lords Highway East, Weston, Connecticut 06883.

11. Defendant WPCS International Inc. is a corporation formed under the laws of the State of Delaware and maintains its principal offices at 600 Eagleview Boulevard, Suite 300, Exton, Pennsylvania 19341. The Company's common stock ("Common Stock") is registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12 of the Exchange Act and the Common Stock trades on the NASDAQ under the symbol WPCS. WPCS is a necessary party as this action is brought by plaintiff in order to obtain a recovery for the Company. WPCS provides communications, infrastructure and contracting services to companies operating in various industries worldwide.

## JURISDICTION AND VENUE

12. Jurisdiction of this Court is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]. Venue is properly laid in this District because defendants Hudson Bay Master Fund Ltd., Iroquois Master Fund Ltd. and American Capital Management LLC are located here.

## SUBSTANTIVE ALLEGATIONS

13. On December 4, 2012, the Company entered into a Securities Purchase Agreement ("SPA") pursuant to which it obtained $4,000,000 in return for (a) $4,000,000 principal amount of convertible notes ("Notes") and (b) warrants to purchase 15,923,567 shares of the Company's Common Stock ("Warrants"). In connection with the SPA, among other agreements, the Company entered into a registration rights agreement with the Defendants (the "Rights Agreement"). The closing date of the sale was December 5, 2012.

14. The SPA was filed with the SEC as an Exhibit to a Form 8-K on December 5, 2012. The SPA listed the schedule of buyers as follows:

| Buyer | Original Principal Amount of Notes | Aggregate Number of Warrant Shares | Purchase Price |
|---|---|---|---|
| Hudson Bay Master Fund Ltd. | $1,357,500 | 5,404,061 | $1,357,500 |
| Iroquois Master Fund Ltd. | $1,257,500 | 5,005,971 | $1,257,500 |
| American Capital Management LLC | $100,000 | 398,089 | $100,000 |
| Bay Capital A.G. | $600,000 | 2,388,535 | $600,000 |
| GRQ Consultants, Inc. 401K c/o Barry Honig | $600,000 | 2,388,535 | $600,000 |
| Richard Molinsky | $85,000 | 338,376 | $85,000 |
| TOTAL | $4,000,000 | 15,923,567 | $4,000,000 |

15. The Notes were originally set to mature eighteen months after the closing date, paid interest at a rate of 4% per year and were also convertible into shares of Common Stock at a conversion price of $2.6376 (this conversion price takes into account a 1 for 7 reverse stock split on May 28, 2013, the conversion price was originally $0.3768 per share). Pursuant to the terms of the SPA, the conversion price adjusted to $2.1539 per share on February 28, 2013, which was the date WPCS shareholders approved the issuance of the Common Stock underlying the Notes. The Warrants were exercisable for a period of five years from the closing date at an initial exercise price of $2.87 ($0.471 pre-reverse split) per share (the "Warrant Exercise Price") and were subject to the same adjustments as provided in the Notes.

16. The SPA and the Rights Agreement, among other documents, establish the circumstances under which Defendants could (a) purchase additional WPCS securities from the Company; and (b) sell into the marketplace the Common Stock obtained through conversion of the

Notes or exercise of the Warrants. The SPA and the Rights Agreement also established the method that would be used to allocate among the Defendants the number of these shares of Common Stock or other WPCS securities each of the Defendants could purchase or sell under such circumstances.

17. The SPA gave each Defendant the right to purchase additional WPCS securities in certain future WPCS offerings conducted by the Company. Each Defendant agreed with both the Company and the other Defendants that in the event the Company conducted a subsequent placement within two years of the purchase of the Notes, each Defendant had the right to participate in the placement *pro rata*, in accordance with the aggregate original principal amount of the Notes purchased by that Defendant.

18. Also, in the Rights Agreement, WPCS and the Defendants agreed upon, *inter alia*, the terms by which Defendants could seek to sell the Common Stock underlying the Notes and Warrants in any public offering of WPCS securities. Thus, pursuant to the Rights Agreement there were three scenarios available to the Defendants that afforded them an opportunity to have WPCS register these securities with the SEC for sale in the open market: Demand Registration; Piggyback Registration; or, an S-3 Registration.

19. For each of these possible scenarios, each Defendant agreed that in the event the Company, its underwriters or certain of the Defendants determined that the aggregate number of WPCS securities sought to be included by Defendants in such registration was too large and would negatively affect the price at which the securities could be sold in the market, the reduced amount of securities the Company would agree to include in such a registration would be allocated, *pro rata*, among the Defendants based on the number of securities initially sought to be registered by each participating Defendant.

20. With respect to Demand Registration, the Rights Agreement provided that upon request, at any time, each of the Defendants had the right to request in writing that the Company

register with the SEC all or part of such Defendant's WPCS securities covered under the Rights Agreement. The Company was then required to promptly give written notice of the requested registration to the other Defendants and include in any such registration statement the WPCS securities sought to be registered by the Defendant who initially demanded registration as well as any WPCS securities sought to be registered by any other Defendant.

21. Section 2(a)(ii) of the Rights Agreement titled "<u>Priority in Demand Registration</u>," provided that if the underwriter of the proposed offering advised the Company that in its opinion, the amount of WPCS securities requested to be included in such registration exceeded the number that could be sold in such an offering within an acceptable price range to the Defendants holding a majority of the securities to be included in the registration, the Company would include in the registration, that number of securities for which it is advised an acceptable price could be obtained. That number of securities would be allocated, *pro rata*, among the Defendants based on the number of securities sought to be registered by each Defendant. This provision concerning allocation was also applied and in effect with respect to the filing of an S-3 Registration with the SEC.

22. Similarly, in Section 2(b)(ii) of the Rights Agreement titled, <u>Priority in Piggyback Registration</u>, the Defendants agreed that in the event that an underwriter advised the Company in connection with an offering of its securities that the amount of securities requested to be included by the Company and Defendants, in accordance with their right under the Rights Agreement, exceeds the amount which can be sold in such an offering without materially interfering with the successful marketing of the securities being offered, the Company would first include the securities that the Company wanted to register for its own account, and second, the securities requested to be included in the registration by the Defendants (allocated among defendants, *pro rata*, in proportion to the number of securities requested to be included in such registration by each of them), and third, other securities of the Company to be registered on behalf of any other person with rights to demand such

registration.

23.     Also, in the case of a registration initiated by a person other than the Company, the Rights Agreement provided that the first securities to be included were those subsequently requested by the Defendants to be included pursuant to the Rights Agreement and were to be allocated among the participating Defendants, *pro rata*, in proportion to the number of securities each Defendant requested to be registered and thereafter, the securities requested to be registered by any person initiating such registration.

24.     The Defendants also agreed that in no event would the Company include any WPCS securities other than those acquired under the Notes or Warrants on any registration statement (other than on a Piggyback Registration) intended to register such WPCS securities "**without the prior written consent of the Required Investors**." Required Investors meant one or more of the Note holders who held a majority of the securities to be included in such registration. The initial number of securities included in any such registration statement and any increase in the number of securities to be included therein is to be first allocated, *pro rata*, among the participating Note holders based on the number of securities held by each Note holder included in the registration statement at the time it is declared effective by the SEC.

25.     By agreeing to act together in coordinating the sale of Common Stock acquired under the Notes or Warrants through the adoption of set terms and principles, including, the method for allocating shares that may be purchased or sold in an offering in proportion to the amount of WPCS securities owned by each participating Defendant or sought to be registered for sale by each Defendant, the Defendants had acted and continued to act together at all relevant times in furtherance of a common objective relating to the purchase, holding and disposing of WPCS securities and thereby formed a shareholder "group" pursuant to Sections 13 and 16 of the Exchange Act. The agreements reached regarding the Notes and Warrants and the underlying Common Stock,

including the proportional registration and sale of Common Stock by signatories to the Rights Agreement were in effect the entire time the Notes were issued and outstanding.

### WPCS Acquires BTX From The Defendants

26. A significant obstacle preventing Defendants from selling their WPCS securities was that on average less than 100,000 shares of the Common Stock was trading each day, while Defendants collectively owned in excess of 10 million shares of WPCS Common Stock or 100 days worth of trading volume. Therefore, it would have taken Defendants no less than 20 weeks to exit their investment in WPCS, assmuming there were no other sellers. In addition, such selling would have undoubtedly exerted additional pressure on the price of the Common Stock.

27. On December 17, 2013, the Company announced that it had entered into a series of agreements to purportedly add a new line of business to the Company's existing operations. Specifically, the Company had acquired BTX Trader, LLC ("BTX") a technology start-up company seeking to provide access to publicly available Bitcoin market. The BTX software was expected to provide users with market data from all major Bitcoin trading venues.

28. At that time, Bitcoin was very much in the news as an alternative non-cash payment system. Specifically, Bitcoin is a peer-to-peer payment system introduced as an open source software in 2009. Although not a real currency, Bitcoin is nonetheless commonly referred to as a digital currency, virtual currency, electronic money, or cryptocurrency. The Bitcoin system is not controlled by a single entity, like a central bank, which has led the US Treasury to call Bitcoin a decentralized currency. Because Bitcoins can be transferred directly from one person to another they are sometimes described as digital cash.

29. In reaction to the excitement caused by the BTX announcement, the trading volume of the Common Stock exploded to over 12,000,000 shares traded on the date of the announcement and reached 33,000,000 shares traded on December 27th while the price of WPCS increased. As

more fully discussed later and unsurprisingly, on December 17th, Defendants started converting their Notes into Common Stock and sold them into this rise in trading volume.

30.     BTX was a start-up, and in the early-stage beta testing of a trading technology platform that was to provide access to ninety percent of the publicly available Bitcoin market.

31.     BTX was formed in the state of Delaware on December 4, 2013 - - 13 days before it was acquired by WPCS - - and was *owned by the Defendants*. The names of the owners of BTX were listed as John O'Rourke, Hudson Bay Master Fund Ltd., Iroquois Master Fund Ltd., American Capital Management LLC, GRQ Consultants, Inc. ROTH 401K fbo Barry Honig, Richard Molinsky, HS Contrarian Investments, LLC, ATG Capital LLC and John Ford.

32.     In connection with forming BTX, Defendants acquired BTX's software and intellectual property rights from principals Divya Thakur, 28, and Ilya Subkhankulov, 24, for an aggregate of $439,408 of Notes, along with $1,185,000 in cash, representing the Defendants initial capital contributions to BTX.

33.     The BTX transaction was completed on December 17, 2013, by WPCS entering into a purchase agreement with the Defendants acting together pursuant to which WPCS acquired BTX in consideration for issuing additional convertible securities to the Defendants. The Company issued an aggregate of 2,438 shares of Series E Convertible Preferred Stock for a total of $2,430,000. Each share of Series E Preferred Stock having a stated value of $1,000 is convertible into shares of Common Stock at a conversion price of $3.50 per share. In addition, Defendants received warrants to purchase up to an aggregate of 1,500,000 shares of Common Stock at $5.00 per share.

34.     The Company recorded the BTX acquisition as capitalized software costs. The Company determined that the capitalized acquisition cost of the BTX software was $3,100,302, based on the fair value of the consideration given. The cost of the asset purchase was based on the

fair value of the Series E Preferred Stock, the fair value of the warrants, and the assumption of a secured promissory note in the principal amount of $500,000.

35. Pursuant to the Purchase Agreement, the Company agreed to use its best efforts to obtain, among other things, its stockholders' approval at the next annual stockholder meeting or a special meeting of stockholders for an increase in the number of shares of Common Stock authorized for issuance to 75,000,000 so that there would be a sufficient number of shares of Common Stock into which the Series E Preferred Stock could be converted.

36. On January 17, 2014, TheStreet.com published an article by Dan Freed titled *A Bitcoin Stock Play That's Scarier Than Bitcoin*. The article stated that the decision by WPCS to acquire Bitcoin software startup BTX looked at best like a desperate move to save a struggling company, and, at worst, looked like a cynical ploy by a pair of hedge funds to take advantage of the Bitcoin frenzy to create some excitement around the stock so the funds could get out from under a troubled loan.

37. The article stated that Defendants Iroquois Capital and Hudson Bay control WPCS and that the purchase of the Notes and Warrants on December 5, 2012 gave Defendants near total control over WPCS as WPCS' interim CEO Sebastian Giordano ("Giordano") told Freed it was the Note holders who "could have bankrupted the company," but instead came to him with the BTX acquisition.

38. The article also stated that it was those same Note holders (*i.e.*, Defendants) "pulling the strings" when, following the BTX/Bitcoin announcement, the shares experienced a "trading frenzy". The trading volume of the Common Stock was usually under 100,000 shares a day but was over 12 million shares on December 18, 2013 the first trading day after the announcement. The share price for that day had a low of $1.52 and a high of $3.12, ultimately closing at $1.64.

39. The article continued to report that on a December 19, 2013 conference call, Giordano and CFO Joseph Heater acknowledged they didn't know how many shares were outstanding at the time. However, on December 20, 2013, WPCS disclosed that it had issued over 4 million shares to six investors upon conversion of a portion of the Notes. WPCS disclosed later that it had issued nearly seven million more shares upon additional conversions of the Notes in three separate transactions. The number of investors receiving these shares was small: two in the first transaction, seven in the second, and two in the third. WPCS then reported that upon additional Note conversions, it had issued another 1.25 million shares to four investors, bringing the total shares converted from the Notes to over 13,000,000.

40. In the article, Freed concluded that the BTX acquisition did not bode well for WPCS because Iroquois and Hudson Bay generally have a reputation for trading in and out of positions and are not looking to be long term investors.

41. Defendants acted together as a shareholder group in their dealings with WPCS at all relevant times. First, they entered into agreements with the Company and each other with regard to the purchasing and selling of WPCS securities, including, the Common Stock underlying their initial acquisition of the Notes and Warrants. Second, they acted as a group in jointly acquiring BTX for the purpose of selling it to WPCS in exchange for additional WPCS securities.

42. In a schedule 13-G filed with the SEC on February 12, 2013, Iroquois Capital Management L.L.C., Joshua Silverman and Richard Abbe declared that they beneficially owned 761,164 shares of Common Stock, which included (i) 96,667 shares of Common Stock and (ii) 664,497 shares of Common Stock in the aggregate issuable upon conversion of a convertible note and/or exercise of a warrant to purchase Common Stock, in each case, held by Iroquois Master Fund, and that as a consequence they beneficially owned approximately 9.99% of the Common Stock.

43. The Schedule 13G declared that the reported number of shares owned excluded 7,662,921 shares of Common Stock in the aggregate issuable to the reporting persons upon conversion of the Notes and exercise of the Warrants because the Notes and Warrants contain a blocker provision under which the holder does not have the right to convert the Note or exercise the Warrant to the extent that such conversion or exercise, as applicable, would result in beneficial ownership by the holder thereof or any of its affiliates, of more than 9.99% of the Common Stock. Without such blocker provisions, each of these reporting persons would have been deemed to have beneficial ownership of 8,424,085 shares of the Common Stock.

44. Similarly on February 7, 2013, Hudson Bay Capital Management, L.P., filed a 13G on behalf of Sander Gerber, and itself representing that they owned $1,358,000 principal amount of 4% Senior Secured Convertible Notes due June 5, 2014 that were convertible into 3,604 shares of Common Stock and Warrants to purchase up to 5,404,061 shares of Common Stock, which were to expire on February 18, 2016 and equaled 9.99% of the outstanding Common Stock. Those securities were held by Hudson Bay Master Fund Ltd

45. The Schedule 13G reported that these reported securities were each subject to a 9.99% blocker provision and the percentage stated gives effect to such provisions. However, the 5,404,061 warrant shares indicate the number of shares of Common Stock that would be issuable upon full exercise of such reported securities and do not give effect to such blocker.

46. As a consequence of the foregoing, the aggregate holdings of two group members alone, Hudson Bay and Iroquois are enough to place each Defendant as a member of a group with all other Defendants above the 10% threshold required by Section 16(b) and subjects each such group member (*i.e.*, all Defendants) to Section 16(b) liability.

47. Defendants are deemed members of a group in having acted together at all relevant times with respect to the acquisition, holding, voting and/or disposition of WPCS equity securities

and each of the Defendants are therefore, the beneficial owner of the shares of Common Stock beneficially owned by the other Defendants pursuant to Section 13(d) of the Exchange Act. Pursuant to Rule 16a-1(a)(1) promulgated by the SEC, Section 13(d) governs the determination of whether a person or entity is a more than 10% "beneficial owner subject to the provisions of Section 16(b)."

### Defendants Purchase and Sell WPCS Common Stock

48. On October 25, 2013, the Company entered into an amendment, waiver and exchange agreement (the Amendment) with the Defendants that amended the conversion features of the Warrants and Notes. Pursuant to the Amendment, the Buyers exchanged 154,961 of their Warrants for 38,740 shares of common stock and new warrants to purchase 154,961 shares of common stock. It was determined that the Black-Scholes value of one warrant being received in the exchange was equal to $1.83, resulting in four warrants being equal to $7.32 and the parties valued the unit including the Common Stock at a price of $7.52. Accordingly, the Common Stock shares issued in the exchange were calculated at $0.20, and by the operation of the terms of the Notes, the conversion price of the Notes automatically adjusted to $0.20.

49. Pursuant to the Amendment, the Defendants permanently waived, effective as of October 24, 2013, various provisions of the remaining 2,119,835 Warrants, including the anti-dilution protection from the issuance of securities at a price lower than the Warrant Exercise Price, and the adjustment to market price on the first anniversary of the date of issuance of the Warrants, among others. The closing of the Amendment transaction occurred on October 30, 2013.

50. The Company reported in a Form 10-Q filed on December 16, 2013 that on November 5, 2013, the Company entered into a further amendment agreement (the "Nov. 5 Amendment") with the Defendants, effective as of October 31, 2013, which, among other things, eliminated certain features of the Notes with regard to redemption rights in the event of a default, altered the interest rate payable on the Notes and changed the term of the instrument. Also, the

Defendants waived certain events of default that had occurred under the Notes. Specifically, the Company reported that:

> On November 5, 2013, the Company entered into an amendment agreement (the Note Amendment) with the Buyers. The closing of the Note Amendment transaction occurred on November 5, 2013, and the Note Amendment was deemed effective as of October 31, 2013. The Note Amendment eliminated certain features of the Notes which would otherwise result in substantial accounting charges to the Company. Prior to the Note Amendment, if an event of default existed under the Notes, the Buyers would have been entitled to redeem $ 3,400,000 in aggregate principal and interest of the Notes for a redemption price equal to the greater of 125 % of (x) the deemed value of the shares of common stock underlying the Note (the Intrinsic Value) and (y) the outstanding principal and unpaid interest under the Notes (the Base Value). The Note Amendment reduces and fixes the event of default redemption price by eliminating the Intrinsic Value calculation and modifying the Base Value calculation and interest rate to more accurately make-whole the holders of the Notes from the loss of interest from an early redemption of the Notes and the decreased value of the Notes without such Intrinsic Value rights. As revised, the event of default redemption amount equals the sum of the Conversion Amount (as defined in the Notes) to be redeemed, plus a make-whole amount equal to the amount of any interest that, but for any redemption of the Notes on such given date, would have accrued with respect to the Conversion Amount being redeemed under the Notes at the interest rate then in effect for the period from such given date through October 31, 2023, the amended maturity date of the Notes, discounted to the present value of such interest using a discount rate of 2.5 % per annum. As a result, the fixed value of the event of default redemption price is approximately $10,900,000. In addition, the interest rate of the Notes was amended to 15 % per annum, subject to increase to 25 % per annum if an event of default occurs and is continuing. The modifications to the Notes as a result of the Amendment and Note Amendment described above included a change in the conversion price of the Notes from $2.1539 to $0.20, and a change in the maturity date of the Note, from June 5, 2014 to October 31, 2023.

51.     According to the Form 10-Q, upon the closing of the November 5 Amendment and as a consequence of the resulting modifications to the Notes, "the Company determined that the Notes were extinguished and New Notes [the "New Notes] were being issued."

52. During the three months ending January 31, 2014, the Notes were converted into over 13,000,000 shares of Common Stock. Within six months of the aforementioned purchase of Common Stock, Defendants sold over 13 million shares of Common Stock for a profit of millions of dollars. During that time period, the market price of the Common Stock fluctuated between $1.32 and $3.39 per share.

53. Accordingly, Defendants acquired and sold in excess of 13,000,000 shares of Common Stock with the purchases and sales (or sales and purchases) occurring within six month periods of each other. These transactions allowed Defendants to earn profits recoverable under Section 16(b) which are subject to disgorgment to the Company.

54. Pursuant to Section 16(b), the foregoing purchases and sales may be matched against one another using the "lowest in, highest out" method for determining profits recoverable from Defendants, to the extent of their respective pecuniary interests therein.

55. As a consequence of the Defendants failure to file Form 4s with the SEC, the number of shares purchased and sold by each of the Defendants during the relevant time period is currently unknown.

## BASIS FOR INFORMATION AND BELIEF

56. Plaintiff's information and belief is based on, among other things: (a) Forms 8-K and their Exhibits filed by WPCS with the SEC on or about December 5, 2012, December 17, 2013, December 19, 2013, December 20, 2014, December 26, 2014 and December 27, 2013 ; and (b) Form 10-Q filed by WPCS with SEC on January 31, 2014.

## ALLEGATIONS AS TO DEMAND

57. On January 29, 2014, demand for prosecution was made on WPCS based on the facts alleged above (the "Demand"). On March 20, 2014, counsel for the Company responded to the Demand and indicated that the Company declined to pursue Section 16(b) claims against Defendants

arising from the facts alleged in the Demand.

58. More than sixty days have passed from the date of the Demand and the Company has failed to recover the profits alleged herein or to institute a lawsuit to recover those profits.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against Defendants in an amount to be determined at trial, plus pre-judgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

DATED this 14th day of July, 2014.

ABRAHAM, FRUCHTER & TWERSKY, LLP

By: _____
Jack G. Fruchter (JF-8435)
Mitchell M.Z. Twersky (MT-6739)
One Pennsylvania Plaza, Suite 2805
New York, New York 10119
Tel.: (212) 279-5050
Fax: (212) 279-3655

**Attorneys for Plaintiff**