IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

ERIC GREENBERG,

                    Plaintiff,                                   Case No.: 14-cv-05226 (DLC)

      - against -

                                           **AMENDED COMPLAINT**

HUDSON BAY MASTER FUND LTD.,
IROQUOIS MASTER FUND LTD.,
AMERICAN CAPITAL MANAGEMENT LLC,          **JURY TRIAL DEMANDED**
and WPCS INTERNATIONAL INCORPORATED,

                    Defendants.

-----------------------------------------------------------------------x

       Plaintiff, by his attorneys, alleges, based upon knowledge with respect to the facts relating to

him and upon information and belief with respect to all other allegations, as follows:

## INTRODUCTION

       1.      This action is brought pursuant to Section 16(b) of the Securities Exchange Act of

1934, as amended (the "Exchange Act"), [15 U.S.C. 78p(b)] ("Section 16(b)") in order to

recover short-swing insider trading profits realized by defendants Hudson Bay Master Fund Ltd.,

Iroquois Master Fund Ltd., and American Capital Management LLC, (collectively referred to as

"Defendants") while they were statutory insiders of WPCS International Incorporated ("WPCS"

or the "Company").

2.      Defendants are members of a group that together beneficially owned more than 10% of the outstanding common stock of WPCS and accordingly, each member of the group is deemed to be the beneficial owner of the WPCS common stock owned by the other members of the group. Herein, group members include Hudson Bay Master Fund Ltd., Iroquois Master Fund Ltd., American Capital Management LLC, GRQ Consultants, Inc. 401K c/o Barry Honig and Richard Molinsky (the "Group"). The Group conduct is manifested in joint agreements governing the acquisition, holding, voting and/or disposition of WPCS securities as well as in a transaction involving the sale of BTX Trader LLC ("BTX") from the Group (including Defendants) and others to the Company.

3.      BTX was an entity created by the Group (including Defendants) and others on December 4, 2013 and sold to the Company 13 days later for consideration valued by the Company at $3.1 million, and purportedly formed to capitalize on trading in Bitcoin which, at that time, was receiving favorable media attention. The increased interest in WPCS by retail investors as a result of the BTX announcement allowed Defendants to purchase (as described *infra*) and sell at a profit WPCS Common Stock by substantially (and temporarily) increasing the trading volume and price of the shares. By the time the Note conversions were completed, the number of WPCS shares outstanding increased by more than thirteen-fold, most of which the Defendants sold to retail investors – at a substantial profit.

4.      Each Defendant is statutorily deemed to have been during all relevant times, a WPCS insider with access to material non-public information concerning WPCS's operations and future business prospects and is subject to the strict liability provisions of Section 16(b). Section 16(b) requires company insiders to disgorge any profits earned through short-swing insider trading (*i.e.*, purchases and sales within a six month period).

## PARTIES

5.      Plaintiff Eric Greenberg is a shareholder of WPCS.

6.      Defendant Hudson Bay Master Fund Ltd., organized under the laws of the Cayman Islands, maintains its principal offices at 777 Third Avenue, 30th Floor, New York, New York 10017.

7.      Defendant Iroquois Master Fund Ltd., organized under the laws of the Cayman Islands, maintains its principal offices c/o Iroquois Capital Management, LLC at 641 Lexington Avenue, 26th Floor, New York, New York 10022.

8.      Defendant American Capital Management LLC, organized under the laws of the Cayman Islands, also maintains its principal offices c/o Iroquois Capital Management, LLC at 641 Lexington Avenue, 26th Floor, New York, New York 10022.

9.      Defendant WPCS International Inc. is a corporation formed under the laws of the State of Delaware and maintains its principal offices at 600 Eagleview Boulevard, Suite 300, Exton, Pennsylvania 19341.  The Company's common stock ("Common Stock") is registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12 of the Exchange Act and the Common Stock trades on the NASDAQ under the symbol WPCS.  WPCS is a necessary party as this action is brought by plaintiff in order to obtain a recovery for the Company. WPCS provides communications, infrastructure and contracting services to companies operating in various industries worldwide.  In its most recent annual report on SEC Form 10-K, the Company reported that it incurred losses from continuing operations and a consolidated net loss of approximately $11 million – and the Company's auditor included a "going concern" explanatory paragraph in its audit report.

## JURISDICTION AND VENUE

10.     Jurisdiction of this Court is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa].  Venue is properly laid in this District because defendants Hudson Bay Master Fund

Ltd., Iroquois Master Fund Ltd. and American Capital Management LLC are located in this District.

## SUBSTANTIVE ALLEGATIONS

11.     On December 4, 2012, the Company entered into a Securities Purchase Agreement ("SPA") pursuant to which it obtained $4,000,000 in return for (a) $ 4,000,000 principal amount of convertible notes ("Notes") and (b) warrants to purchase 15,923,567 shares of the Company's Common Stock ("Warrants"). In connection with the SPA, among other agreements, the Company entered into a registration rights agreement with the Buyers – Group members (including Defendants) and others – (the "Rights Agreement").  The closing date of the sale was December 5, 2012.

12.     The SPA was filed with the SEC as an Exhibit to a Form 8-K on December 5, 2012. The SPA listed the schedule of Buyers as follows:

| Buyers | Original Principal Amount of Notes | Aggregate Number of Warrant Shares | Purchase Price |
|---|---|---|---|
| Hudson Bay Master Fund Ltd. | $1,357,500 | 5,404,061 | $1,357,500 |
| Iroquois Master Fund Ltd. | $1,257,500 | 5,005,971 | $1,257,500 |
| American Capital Management LLC | $100,000 | 398,089 | $100,000 |
| Bay Capital A.G. | $600,000 | 2,388,535 | $600,000 |
| GRQ Consultants, Inc. 401K c/o Barry Honig | $600,000 | 2,388,535 | $600,000 |
| Richard Molinsky | $85,000 | 338,376 | $85,000 |
| TOTAL | $4,000,000 | 15,923,567 | $4,000,000 |

13.     Thus, Defendants Hudson Bay Master Fund Ltd., Iroquois Master Fund Ltd. and American Capital Management LLC purchased 34%, 31% and 3% of the Notes, respectively – for a total of 68% of the Notes.

14.     The Notes were originally set to mature eighteen months after the closing date, paid interest at a rate of 4% per year and were also convertible into shares of Common Stock at a conversion price of $2.6376 (this conversion price takes into account a 1 for 7 reverse stock split on May 28, 2013, the conversion price was originally $0.3768 per share). Pursuant to the terms of the SPA, the conversion price adjusted to $2.1539 per share on February 28, 2013, which was the date WPCS shareholders approved the issuance of the Common Stock underlying the Notes.  The Warrants were exercisable for a period of five years from the closing date at an initial exercise price of $2.87 ($0.471 pre-reverse split) per share (the "Warrant Exercise Price") and were subject to the same adjustments as provided in the Notes.

15.     The SPA and the Rights Agreement, among other documents, establish the circumstances under which Buyers (the Group members (including Defendants) and one non-defendant) could (a) purchase additional WPCS securities from the Company; and (b) sell into the marketplace the Common Stock obtained through conversion of the Notes or exercise of the Warrants. The SPA and the Rights Agreement also established the method that would be used to allocate among the Buyers the number of these shares of Common Stock or other WPCS securities each of the Buyers could purchase or sell under such circumstances.

16.     The SPA gave each Buyer (the Group members (including Defendants) and one non-defendant) the right to purchase additional WPCS securities in certain future WPCS offerings conducted by the Company. Each Buyer agreed with both the Company and the other Buyers that in the event the Company conducted a subsequent placement within two years of the purchase of the Notes, each Buyer had the right to participate in the placement *pro rata*, in accordance with the aggregate original principal amount of the Notes purchased by that Buyer.

17.     Also, in the Rights Agreement, WPCS and the Buyers (the Group members (including Defendants) and one non-defendant) agreed upon, *inter alia*, the terms by which Buyers

could seek to sell the Common Stock underlying the Notes and Warrants in any public offering of WPCS securities.  Thus, pursuant to the Rights Agreement there were three scenarios available to Buyers that afforded them an opportunity to have WPCS register these securities with the SEC for sale in the open market:  Demand Registration; Piggyback Registration; or, an S-3 Registration.

18.     For each of these possible scenarios, each Buyer (the Group members (including Defendants) and one non-defendant) agreed that in the event the Company, its underwriters or certain of the Buyers determined that the aggregate number of WPCS securities sought to be included by Buyers in such registration was too large and would negatively affect the price at which the securities could be sold in the market, the reduced amount of securities the Company would agree to include in such a registration would be allocated, *pro rata*, among the Buyers based on the number of securities initially sought to be registered by each participating Buyer.

19.     With respect to Demand Registration, the Rights Agreement provided that upon request, at any time, each of the Buyers (the Group members (including Defendants) and one non-defendant) had the right to request in writing that the Company register with the SEC all or part of such Buyer's WPCS securities covered under the Rights Agreement.  The Company was then required to promptly give written notice of the requested registration to the other Buyers and include in any such registration statement the WPCS securities sought to be registered by the Buyer who initially demanded registration as well as any WPCS securities sought to be registered by any other Buyer.

20.     Section 2(a)(ii) of the Rights Agreement titled "Priority in Demand Registration," provided that if the underwriter of the proposed offering advised the Company that in its opinion, the amount of WPCS securities requested to be included in such registration exceeded the number that could be sold in such an offering within an acceptable price range to the Buyers (the Group members (including Defendants) and one non-defendant) holding a majority of the securities to be

included in the registration, the Company would include in the registration, that number of securities for which it is advised an acceptable price could be obtained.  That number of securities would be allocated, *pro rata*, among the Buyers based on the number of securities sought to be registered by each Buyer.   This provision concerning allocation was also applied and in effect with respect to the filing of an S-3 Registration with the SEC.

21.     Similarly, in Section 2(b)(ii) of the Rights Agreement titled, <u>Priority in Piggyback Registration</u>, the Buyers (the Group members (including Defendants) and one non-defendant) agreed that in the event that an underwriter advised the Company in connection with an offering of its securities that the amount of securities requested to be included by the Company and Buyers, in accordance with their right under the Rights Agreement, exceeds the amount which can be sold in such an offering without materially interfering with the successful marketing of the securities being offered, the Company would first include the securities that the Company wanted to register for its own account, and second, the securities requested to be included in the registration by the Buyers (allocated, *pro rata,* in proportion to the number of securities requested to be included in such registration by each of them), and third, other securities of the Company to be registered on behalf of any other person with rights to demand such registration.

22.     Also, in the case of a registration initiated by a person other than the Company, the Rights Agreement provided that the first securities to be included were those subsequently requested by the Buyers (the Group members (including Defendants) and one non-defendant) to be included pursuant to the Rights Agreement and were to be allocated among the participating Buyers, *pro rata*, in proportion to the number of securities each Buyer requested to be registered and thereafter, the securities requested to be registered by any person initiating such registration.

23.     The Buyers (the Group members (including Defendants) and one non-defendant) also agreed that in no event would the Company include any WPCS securities other than those acquired

under the Notes or Warrants on any registration statement (other than on a Piggyback Registration) intended to register such WPCS securities "**without the prior written consent of the Required Investors**." Required Investors meant one or more of the Note holders who held a majority of the securities to be included in such registration. The initial number of securities included in any such registration statement and any increase in the number of securities to be included therein is to be first allocated, *pro rata*, among the participating Note holders based on the number of securities held by each Note holder included in the registration statement at the time it is declared effective by the SEC.

24.     By agreeing to act together in coordinating the sale of Common Stock acquired under the Notes or Warrants through the adoption of set terms and principles, including, the method for allocating shares that may be purchased or sold in an offering in proportion to the amount of WPCS securities owned by each Group member, including Defendants, or sought to be registered for sale by each Group member, the Group, including Defendants, acted and continued to act together at all relevant times in furtherance of a common objective relating to the purchase, holding and disposing of WPCS securities and thereby formed a shareholder "group" pursuant to Sections 13 and 16 of the Exchange Act.  The agreements reached regarding the Notes and Warrants and the underlying Common Stock, including the proportional registration and sale of Common Stock by signatories to the Rights Agreement were in effect the entire time the Notes were issued and outstanding.

**WPCS Acquires BTX From The Group (Including Defendants) And Others**

25.     A significant obstacle preventing the Group, including Defendants, from selling their WPCS securities was that on average less than 100,000 shares of the Common Stock was trading each day, while the Group collectively owned in excess of 10 million shares of WPCS Common Stock or 100 days worth of trading volume.  Therefore, it would have taken the Group members no less than 20 weeks to exit their investment in WPCS, assuming there were no other sellers. In

addition, such selling would have undoubtedly exerted additional pressure on the price of the Common Stock.

26.     On December 17, 2013, after the stock markets closed, the Company announced that it had entered into a series of agreements to purportedly add a new line of business to the Company's existing operations.  Specifically, the Company had acquired BTX Trader, LLC ("BTX") a technology start-up company seeking to provide access to publicly available Bitcoin market.  The BTX software was expected to provide users with market data from all major Bitcoin trading venues.

27.     At that time, Bitcoin was very much in the news as an alternative non-cash payment system. Specifically, Bitcoin is a peer-to-peer payment system introduced as an open source software in 2009. Although not a real currency, Bitcoin is nonetheless commonly referred to as a digital currency, virtual currency, electronic money, or cryptocurrency. The Bitcoin system is not controlled by a single entity, like a central bank, which has led the US Treasury to call Bitcoin a decentralized currency. Because Bitcoins can be transferred directly from one person to another they are sometimes described as digital cash.

28.     In reaction to the excitement caused by the BTX announcement, the trading volume of the Common Stock exploded to over 12,000,000 shares traded on the first trading day after the announcement and reached 33,000,000 shares traded on December 27th while the price of WPCS increased. As more fully discussed later and unsurprisingly, on December 17th, the Group members (including Defendants) started converting their Notes into Common Stock and sold them into this rise in trading volume.

29.     BTX was a start-up, and in the early-stage beta testing of a trading technology platform that was to provide access to ninety percent of the publicly available Bitcoin market.

30.     BTX was formed in the state of Delaware on December 4, 2013 - - 13 days before it

was acquired by WPCS - - and was **owned by, inter alia, the Group members, including**

**Defendants**. The names of the owners of BTX were listed as John O'Rourke, Hudson Bay Master

Fund Ltd., Iroquois Master Fund Ltd., American Capital Management LLC, GRQ Consultants, Inc.

ROTH 401K fbo Barry Honig, Richard Molinsky, HS Contrarian Investments, LLC, ATG Capital

LLC and John Ford.

      31.     In connection with forming BTX, Group members (including Defendants) and others,

acquired BTX's software and intellectual property rights from principals Divya Thakur, 28, and Ilya

Subkhankulov, 24, for an aggregate of $439,408 of Notes, along with $1,185,000 in cash,

representing the initial capital contributions to BTX.

      32.     The BTX transaction was completed on December 17, 2013, by WPCS entering into

a purchase agreement with the Group members (including Defendants) and others acting together

pursuant to which WPCS acquired BTX in consideration for issuing additional convertible securities

to the sellers. The Company issued an aggregate of 2,438 shares of Series E Convertible Preferred

Stock for a total of $2,430,000.  Each share of Series E Preferred Stock having a stated value of

$1,000 is convertible into shares of Common Stock at a conversion price of $3.50 per share.  In

addition, sellers received warrants to purchase up to an aggregate of 1,500,000 shares of Common

Stock at $5.00 per share.

      33.     The Company recorded the BTX acquisition as capitalized software costs. The

Company determined that the capitalized acquisition cost of the BTX software was $3,100,302,

based on the fair value of the consideration given. The cost of the asset purchase was based on the

fair value of the Series E Preferred Stock, the fair value of the warrants, and the assumption of a

secured promissory note in the principal amount of $500,000.

      34.     Pursuant to the Purchase Agreement, the Company agreed to use its best efforts to

obtain, among other things, its stockholders' approval at the next annual stockholder meeting or a

special meeting of stockholders for an increase in the number of shares of Common Stock authorized for issuance to 75,000,000 so that there would be a sufficient number of shares of Common Stock into which the Series E Preferred Stock could be converted.

35.     On January 17, 2014, TheStreet.com published an article by Dan Freed titled *A Bitcoin Stock Play That's Scarier Than Bitcoin.*  The article stated that the decision by WPCS to acquire Bitcoin software startup BTX looked at best like a desperate move to save a struggling company, and, at worst, looked like a cynical ploy by a pair of hedge funds to take advantage of the Bitcoin frenzy to create some excitement around the stock so the funds could get out from under a troubled loan.

36.     The article stated that Defendants Iroquois Capital and Hudson Bay control WPCS and that the purchase of the Notes and Warrants on December 5, 2012 gave them near total control over WPCS as WPCS' interim CEO Sebastian Giordano ("Giordano") told Freed it was the Note holders who "could have bankrupted the company," but instead came to him with the BTX acquisition.

37.     The article also stated that it was those same Note holders (led by Defendants Iroquois Capital and Hudson Bay) "pulling the strings" when, following the BTX/Bitcoin announcement, the shares experienced a "trading frenzy". The trading volume of the Common Stock was usually under 100,000 shares a day but was over 12 million shares on December 18, 2013 the first trading day after the announcement. The share price for that day had a low of $1.52 and a high of $3.12, ultimately closing at $1.64.

38.     In the article, Freed concluded that the BTX acquisition did not bode well for WPCS because Iroquois and Hudson Bay generally have a reputation for trading in and out of positions and are not looking to be long term investors.

**Defendants Purchase and Sell WPCS Common Stock**

39.     On August 1, 2013, WPCS disclosed that on July 30, 2013 it had issued 158,000 shares to two investors upon conversion of the Notes (340,839 face value); and on August 1, 2013 it had issued 117,500 shares to two investors upon conversion of the Notes ($253,084 face value).

40.     On December 20, 2013, WPCS disclosed that it had issued (between December 17 and 19, 2013) 4,153,179 shares to six investors upon conversion of the Notes ($827,000 face value). Consequently, as there were only six Buyers of the Notes, Hudson Bay Master Fund Ltd. and Iroquois Master Fund Ltd. were among these six investors.

41.     On December 31, 2013, WPCS disclosed that it had issued 6,415,811 more shares upon additional conversions of the Notes ($1,271,440 face value) in three separate transactions. The number of investors receiving these shares was small: two in the first transaction (on December 19, 2013), seven in the second (on December 27, 2013), and two in the third (on December 30, 2013). For the December 27, 2013 conversion, the Company did not disclose how there came to be seven investors.

42.     On January 14, 2014, WPCS disclosed that upon additional Note conversions ($264,313 face value), it had issued another 1,250,702 shares to four investors (between December 31, 2013 and January 13, 2014).

43.     In the transactions from July 30, 2013 through January 13, 2014, Notes ($2,956,676 face value) were converted into 12,095,192 shares of Common Stock.  Also on January 14, 2014, WPCS disclosed that as of the close of business on January 13, 2014, the Company had 13,303,622 shares of Common Stock outstanding.  By comparison, WPCS reported 999,538 shares of Common Stock outstanding in its April 30, 2013 Annual Report on SEC Form 10-K, filed on July 29, 2013.

44.     Approximately 91% of WPCS shares of Common Stock outstanding on January 13, 2014 were the result of conversions of the Notes.

45.     Hudson Bay Master Fund Ltd. and Iroquois Master Fund Ltd. were – by far – the two largest initial holders of the Notes (34% and 31%, respectively).  Through January 13, 2014, approximately 75% of the Notes were converted, including by Hudson Bay Master Fund Ltd. and Iroquois Master Fund Ltd.  Converting Notes but not selling the stock would violate the blocker provisions, discussed *infra*, and would have triggered SEC Schedule 13D and Form 4 reporting requirements (and no such forms were filed by Hudson Bay Master Fund Ltd. or Iroquois Master Fund concerning shares of WPCS Common Stock during any relevant period).

46.     In a schedule 13G filed with the SEC on February 12, 2013, Iroquois Capital Management L.L.C., Joshua Silverman and Richard Abbe declared that they beneficially owned 761,164 shares of Common Stock, which included (i) 96,667 shares of Common Stock and (ii) 664,497 shares of Common Stock in the aggregate issuable upon conversion of a convertible note and/or exercise of a warrant to purchase Common Stock, in each case, held by Iroquois Master Fund, and that as a consequence they beneficially owned approximately 9.99% of the Common Stock.

47.     In a Schedule 14A Proxy Statement that WPCS filed with the SEC on January 17, 2014, WPCS disclosed that Iroquois Capital Management L.L.C. is the investment manager of Iroquois Master Fund Ltd.

48.     Iroquois Capital Management L.L.C. acted as an investment adviser for its advisory client, Defendant Iroquois Master Fund Ltd., with respect to the Notes reported on the February 12, 2013 13G.

49.     Defendant Iroquois Master Fund Ltd. was a beneficial owner of the Notes reported on the February 12, 2013 13G, which were convertible into Common Stock – purportedly limited to 9.99% of the outstanding Common Stock of WPCS.

50.     The February 12, 2013 Schedule 13G declared that the reported number of shares

owned excluded 7,662,921 shares of Common Stock in the aggregate issuable to the reporting persons upon conversion of the Notes and exercise of the Warrants because the Notes and Warrants contain a blocker provision under which the holder does not have the right to convert the Note or exercise the Warrant to the extent that such conversion or exercise, as applicable, would result in beneficial ownership by the holder thereof or any of its affiliates, of more than 9.99% of the Common Stock. Without such blocker provisions, each of these reporting persons would have been deemed to have beneficial ownership of 8,424,085 shares of the Common Stock.

51.     Similarly on February 7, 2013, Hudson Bay Capital Management, L.P., filed a 13G on behalf of Sander Gerber, and itself representing that they owned $1,358,000 principal amount of 4% Senior Secured Convertible Notes due June 5, 2014 that were convertible into Common Stock and Warrants to purchase up to 5,404,061 shares of Common Stock, which were to expire on February 18, 2016 and equaled 9.99% of the outstanding Common Stock.  The Notes were convertible into 36 million shares of WPCS Common Stock at a time when the Company had fewer than one million shares of Common Stock outstanding.

52.     In a Schedule 14A Proxy Statement that WPCS filed with the SEC on January 17, 2014, WPCS disclosed that Hudson Bay Capital Management, L.P. is the investment manager of Hudson Bay Master Fund Ltd.

53.     Hudson Bay Capital Management, L.P. acted as an investment adviser for its advisory client, Defendant Hudson Bay Master Fund Ltd., with respect to the Notes reported on the February 7, 2013 13G.

54.     Hudson Bay Capital Management, L.P. had shared voting and dispositive power over the Notes reported on the February 7, 2013 13G.  Hudson Bay Capital Management, L.P. shared that voting and dispositive power with its advisory client, Defendant Hudson Bay Master Fund Ltd.

55.     Defendant Hudson Bay Master Fund Ltd. was a beneficial owner of the Notes

reported on the February 7, 2013 13G, which were convertible into Common Stock – purportedly limited to 9.99% of the outstanding Common Stock of WPCS.

56.     The Schedule 13G reported that these securities were each subject to a 9.99% blocker provision and the percentage stated gives effect to such provisions.  However, the 5,404,061 warrant shares indicate the number of shares of Common Stock that would be issuable upon full exercise of such reported securities and do not give effect to such blocker.

57.     The blocker provision does not purport to cap the shares converted by a Section 13 or Section 16 group – and, it did not.

58.     In this case, the blocker provision purported to cap the individual holdings of the Buyers (including Defendants, as well as investment advisers Iroquois Capital Management L.L.C. and Hudson Bay Capital Management L.P.) – each at 9.99% of the Common Stock of WPCS.

59.     The SEC has taken the position that blocker provisions "must be examined on a case-by-case basis to determine whether they are binding and valid."  Brief of the S.E.C., *Amicus Curiae*, in Support of Appellee, *Levy v. Southbrook International Investments, Ltd.*, No. 00-7630 (2d Cir. March 23, 2001) at 24-25.  "Factors that indicate that a conversion cap is *illusory* include whether the cap: [i] is easily waivable by the parties (particularly the holder of the convertible securities); [ii] lacks an enforcement mechanism; [iii] has not been adhered to in practice; or [iv] can be avoided by transferring the securities to an affiliate of the holder."  *Id* at 25.  In this case, the blocker provisions were illusory because, among other reasons, they lacked an effective enforcement mechanism.  For example, WPCS lacked sufficient understanding of the number of shares of its Common Stock that were outstanding (as Giordano and CFO Joseph Heater acknowledged in a conference call on December 19, 2013) to effectively police the provision.  In addition, the blocker provisions were also illusory because they were not adhered to in practice.

60.     The 19.98% aggregate holdings of two Group members alone, Iroquois Master Fund

Ltd. and Hudson Bay Master Fund Ltd., are enough to place each Defendant as a member of a group

(the Group) with all other Group members above the 10% threshold required by Section 16(b) and

subjects each such Group member (including Defendants) to Section 16(b) liability.

**Amendment, Waiver And Exchange Agreements**

61.    On October 25, 2013, the Company entered into an amendment, waiver and exchange

agreement (the "Amendment") with the Buyers (the Group members (including Defendants) and one

non-defendant) that amended the conversion features of the Warrants and Notes. Pursuant to the

Amendment, the Buyers exchanged 154,961 of their Warrants for 38,740 shares of common stock

and new warrants to purchase 154,961 shares of common stock. It was determined that the Black-

Scholes value of one warrant being received in the exchange was equal to $1.83, resulting in four

warrants being equal to $7.32 and the parties valued the unit including the Common Stock at a price

of $7.52. Accordingly, the Common Stock shares issued in the exchange were calculated at $0.20,

and by the operation of the terms of the Notes, the conversion price of the Notes automatically

adjusted to $0.20.

62.    Pursuant to the Amendment, the Buyers (the Group members (including Defendants)

and one non-defendant) permanently waived, effective as of October 24, 2013, various provisions of

the remaining 2,119,835 Warrants, including the anti-dilution protection from the issuance of

securities at a price lower than the Warrant Exercise Price, and the adjustment to market price on the

first anniversary of the date of issuance of the Warrants, among others.   The closing of the

Amendment transaction occurred on October 30, 2013.

63.    The Company reported in a Form 10-Q filed on December 16, 2013 that on

November 5, 2013, the Company entered into a further amendment agreement (the "November 5

Amendment") with the Buyers (the Group members (including Defendants) and one non-defendant),

effective as of October 31, 2013, which, among other things, eliminated certain features of the Notes

with regard to redemption rights in the event of a default, altered the interest rate payable on the

Notes and changed the term of the instrument.  Also, the Buyers waived certain events of default

that had occurred under the Notes. Specifically, the Company reported that:

> On November 5, 2013, the Company entered into an amendment
> agreement (the Note Amendment) with the Buyers. The closing of the
> Note Amendment transaction occurred on November 5, 2013, and the
> Note Amendment was deemed effective as of October 31, 2013. The
> Note Amendment eliminated certain features of the Notes which
> would otherwise result in substantial accounting charges to the
> Company. Prior to the Note Amendment, if an event of default existed
> under the Notes, the Buyers would have been entitled to redeem $
> 3,400,000 in aggregate principal and interest of the Notes for a
> redemption price equal to the greater of 125 % of (x) the deemed
> value of the shares of common stock underlying the Note (the Intrinsic
> Value) and (y) the outstanding principal and unpaid interest under the
> Notes (the Base Value). The Note Amendment reduces and fixes the
> event of default redemption price by eliminating the Intrinsic Value
> calculation and modifying the Base Value calculation and interest rate
> to more accurately make-whole the holders of the Notes from the loss
> of interest from an early redemption of the Notes and the decreased
> value of the Notes without such Intrinsic Value rights. As revised, the
> event of default redemption amount equals the sum of the Conversion
> Amount (as defined in the Notes) to be redeemed, plus a make-whole
> amount equal to the amount of any interest that, but for any
> redemption of the Notes on such given date, would have accrued with
> respect to the Conversion Amount being redeemed under the Notes at
> the interest rate then in effect for the period from such given date
> through October 31, 2023, the amended maturity date of the Notes,
> discounted to the present value of such interest using a discount rate of
> 2.5 % per annum. As a result, the fixed value of the event of default
> redemption price is approximately $10,900,000. In addition, the
> interest rate of the Notes was amended to 15 % per annum, subject to
> increase to 25 % per annum if an event of default occurs and is
> continuing. The modifications to the Notes as a result of the
> Amendment and Note Amendment described above included a change
> in the conversion price of the Notes from $2.1539 to $0.20, and a
> change in the maturity date of the Note, from June 5, 2014 to October
> 31, 2023.

64.     According to the Form 10-Q, upon the closing of the November 5

Amendment and as a consequence of the resulting modifications to the Notes, "the Company

determined that the Notes were extinguished and New Notes [the "New Notes"] were being

issued."

65.     From July 30, 2013 through January 13, 2014, the Notes were converted into approximately 12.1 million shares of Common Stock (see ¶ 43).

66.     The material changes to the Notes in the amendments resulting in the New Notes being issued constituted purchases under Section 16(b) to which the foregoing sales are matchable.

67.     Within six months of the aforementioned purchase of Common Stock, the Group (including Defendants) sold the converted shares of Common Stock for a profit of millions of dollars.  The trading volume during the conversion period shows that Defendants sold their converted shares into the market.  Trading volume on December 16, 2013 – the day before Note conversions began in earnest (and the day before the Group (including Defendants) and others sold BTX to the Company) – was 164,800 shares.  Trading volume after that shows the impact of the share conversions – for example, the ten trading days through December 31, 2013 are shown below:

| Date | Volume |
|---|---|
| 12/17/13 | 3,065,100 |
| 12/18/13 | 12,271,500 |
| 12/19/13 | 2,803,600 |
| 12/20/13 | 2,491,700 |
| 12/23/13 | 853,600 |
| 12/24/13 | 292,300 |
| 12/26/13 | 981,600 |
| 12/27/13 | 33,033,200 |
| 12/30/13 | 6,681,800 |
| 12/31/13 | 5,581,600 |

68.     During these ten trading days, the market price of the Common Stock fluctuated between $1.51 and $3.13 per share.

69.     The timeline in this case shows the group conduct.  First, the Group (including Defendants) and others entered into agreements with the Company and each other with regard to the acquisition, holding, voting and/or disposition of WPCS securities, including, the Common Stock underlying their initial acquisition of the Notes and Warrants.  Second, the Group acted together

18

when they and others purchased the Bitcoin trading market-related assets that they contributed to BTX, which they formed on December 4, 2013.  Third, the Group acted together when they and others sold BTX to WPCS (over which they had leverage as noteholders) on December 17, 2013.

70.     Defendants converted Notes to Common Shares, and sold their converted shares into the market excitement over the BTX deal.

71.     Defendants are deemed members of a group (the Group) in having acted together at all relevant times with respect to the acquisition, holding, voting and/or disposition of WPCS equity securities and each of the Defendants are therefore, the beneficial owner of the shares of Common Stock beneficially owned by the other Group members pursuant to Section 13(d) of the Exchange Act. Pursuant to Rule 16a-1(a)(1) promulgated by the SEC, Section 13(d) governs the determination of whether a person or entity is a more than 10% "beneficial owner subject to the provisions of Section 16(b)."

72.     Accordingly, the Group (including Defendants) acquired and sold approximately 12.1 million shares of Common Stock with the purchases and sales (or sales and purchases) occurring within six month periods of each other. These transactions allowed Defendants to earn profits recoverable under Section 16(b) which are subject to disgorgement to the Company.

73.     Pursuant to Section 16(b), the foregoing purchases and sales may be matched against one another using the "lowest in, highest out" method for determining profits recoverable from Defendants, to the extent of their respective pecuniary interests therein.

74.     As a consequence of the Defendants failure to file Form 4s with the SEC, the number of shares purchased and sold by each of the Defendants during the relevant time period is currently unknown.

## BASIS FOR INFORMATION AND BELIEF

75.     Plaintiff's information and belief is based on, among other things: (a) Forms 8-K and their Exhibits filed by WPCS with the SEC on or about December 5, 2012, August 1, 2013, December 17, 2013, December 19, 2013, December 20, 2013 and January 14, 2014; and (b) Form 10-Q filed by WPCS with the SEC on December 16, 2013.

## ALLEGATIONS AS TO DEMAND

76.     On January 29, 2014, demand for prosecution was made on WPCS based on the facts alleged above (the "Demand").  On March 20, 2014, counsel for the Company responded to the Demand and indicated that the Company declined to pursue Section 16(b) claims against Defendants arising from the facts alleged in the Demand.

77.     More than sixty days have passed from the date of the Demand and the Company has failed to recover the profits alleged herein or to institute a lawsuit to recover those profits.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against Defendants in an amount to be determined at trial, plus pre-judgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

DATED this 15th day of October, 2014.

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

By:   /s/ Jack G. Fruchter
       Jack G. Fruchter (JF-8435)
       Mitchell M.Z. Twersky (MT-6739)
       Jeffrey S. Abraham (JA-2946)
       Mark S. Hamill (*pro hac vice*)
       One Pennsylvania Plaza, Suite 2805
       New York, New York 10119
       Tel.: (212) 279-5050
       Fax: (212) 279-3655

       **Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2014, I caused the foregoing AMENDED COMPLAINT to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing documents or paper to be mailed via United States Postal Service to any non-CM/ECF participants indicated on the manual Notice List.

I certify under the laws of the United States of America that the foregoing is true and correct.

Executed on October 15, 2014.

/s/ Mark S. Hamill
Mark S. Hamill